M. L. Jackson, Administrator of the Estate of
Spurgeon Ralph Hamlette, Etc.

*v.*

Harry Cockill

(No. 12323)

Submitted September 8, 1964.   Decided November 17, 1964.

*Hudgins & Coulling, L. R. Coulling, Jr., Barley & Goode, Grover C. Goode,* for appellant.

*Merrell I. Budnick, W. H. Ballard, II, C. Thomas Seay,* for appellee.

BERRY, JUDGE:

This action for wrongful death was instituted in the Circuit Court of McDowell County by the plaintiff, M. L. Jackson as Administrator of the Estate of Spurgeon Ralph Hamlette, also known as Spurgeon Ralph Hancock, deceased, against the defendant, Harry Cockill. When the complaint was filed instituting this action it also contained as part "B" an action by the plaintiff as Administrator of the Estate of the deceased for pecuniary damages on behalf of the estate of the deceased consisting of hospital and medical expenses and funeral expenses in the amount of $2176.97, but when the case was called for trial, the trial court, apparently on its own motion, dismissed the action for pecuniary damages which action and ruling was objected to by the plaintiff. Upon motion of the plaintiff, which was granted by the trial court, the action for wrongful death was amended to show that in addition to Laura Hancock, alleged in the original complaint as a maternal great aunt and sole heir and next of kin to the decedent George Hamlette, Thelma Hamlette and Bessie Hamlette were also distributees of the decedent. During the trial funeral expenses in the amount of $741.14, for which one of the alleged distributees was liable, was allowed to be introduced into evidence and considered by the jury in connection with the awarding of damages to the plaintiff. The jury returned a verdict in favor of the plaintiff in the amount of $7741.14 which was separated into two findings by the jury, one in favor of the plaintiff for $7000.00 "damages" and one in favor of the plaintiff for $741.14 "pecuniary damages", after which judgment was entered by

the trial court upon the jury's verdict in the amount of $7741.14. The motion to set aside the verdict of the jury and judgment entered thereon was overruled by the trial court and a final order was entered on July 6. 1963. Upon application to this Court an appeal and supersedeas was granted on March 23, 1964 and the case was submitted for decision of this Court on arguments and briefs at the September Regular Term, 1964, of this Court.

The action arose out of an automobile accident which occurred in the town of Keystone, McDowell County, West Virginia, on U.S. Route 52 on January 17, 1962 at about 6:25 p.m. when the plaintiff's decedent was fatally injured when struck by an automobile owned and operated by the defendant. The plaintiff's decedent was a negro and was wearing dark clothes at the time of the accident. He was attempting to cross the street or highway, which was 30 feet wide and consisted of three ten foot lanes. He was carrying several bottles of 7-Up, a soft drink, just purchased at a small market known as "Steve's Market", which is located on the south side of the street. The street or highway where the accident occurred is straight for over 1000 feet in an easterly direction toward Northfork, West Virginia, where the defendant had eaten dinner at his customary restaurant. The street lights were on at the time of the accident as were the headlights of defendant's automobile. The defendant was driving in a westerly direction in the right hand or northern lane. There were no other vehicles approaching from the opposite direction and the defendant stated he was driving about 25 miles per hour at the time of the accident and was on his way home to watch television or to read. He testified he was looking to his right in order to ascertain whether or not anyone was coming out into the highway from the intersection to Burke's Addition, that he did not see the plaintiff's decedent until he was two or four feet from him, at which time the decedent's head was down and he walked into the left front of his automobile; that he applied his brakes and stopped his automobile as soon as possible but the decedent was knocked upon the car, denting the hood and then thrown forward. It appears that the plaintiff's decedent had crossed two of the ten foot lanes and

with his head down was walking into the third lane in which the defendant's car was being driven at which time he was struck by the left front of defendant's vehicle. The left front part of the hood of defendant's automobile was dented when the plaintiff's decedent came in contact with the automobile and although the defendant testified that decedent "slipped along the road" after being hit and that he stopped his car within 40 to 50 feet after the accident and that the defendant was then six to eight feet in front of the car, other witnesses testified that the plaintiff's decedent was lying some 50 to 60 feet in front of the automobile after it had been stopped. Michael Colo, the eleven year old son of Steve Colo the owner of "Steve's Market" was in front of his father's store at the time of the accident. This witness stated that he did not know whether the plaintiff's decedent looked in either direction before he started across the street, but that it looked like he was looking down at the time he crossed the street and was struck by defendant's automobile; that he thought he was going to get hit and so told his father. He further stated that " * * * it seemed like he was taking high steps and he walked right into the left side of the car and it knocked him into the air * * * ".

Ernest Woody, Jr., another eye witness to this accident, stated that he believed the plaintiff's decedent looked up and down but that he didn't know whether he did or not and that he saw the defendant's automobile approaching from the right and the plaintiff's decedent walked out into the street, that the defendant applied his brakes but that he, Woody, turned his head before the accident occurred. Woody further stated it seemed to him that the plaintiff's decedent had been drinking but that he did not know "for sure", although he smelled whiskey on the breath of plaintiff's decedent.

The Chief of Police of Keystone, James Oliver, arrived on the scene of the accident soon after it occurred and before the defendant's automobile had been moved. This witness stated that he observed skid marks behind defendant's automobile but he did not measure them at that time, that although plaintiff's decedent's body had been removed from

the scene when he arrived he observed blood spots on the road where the body had been and that these marks were approximately 50 feet from the defendant's automobile and in front of it. A Member of the Department of Public Safety, Trooper J. R. Harsh, arrived on the scene of the accident about three hours after it occurred and in company with Chief of Police Oliver measured skid marks behind defendant's automobile. Trooper Harsh stated that they measured 91 feet and 11 inches. Objection was made by the defendant to the testimony of the State Trooper with regard to the skid marks because the automobile had been moved and such testimony was hearsay. However, the skid marks were pointed out to him by Oliver who saw them before defendant's automobile had been moved. The objection was overruled by the trial court.

The trial court refused to allow the defendant to introduce evidence by Chief of Police Oliver that the decedent had been arrested and placed in jail on numerous occasions for being drunk, that he slept in alleys during the summer and that he had been drinking about 1 o'clock p.m. on the day of the accident. However, the trial court allowed evidence to be introduced over the objection of the defendant to the effect that Laura Hancock, 85 years of age, who, as aunt, had reared the plaintiff's decedent and was his nearest of kin, was real nervous, crying and "going on" about her "son" and almost collapsed when advised of his death.

The plaintiff's decedent was taken to the Stevens Clinic in Welch after the accident where he remained in an unconscious condition until February 26, 1962 at which time he expired.

The errors relied on for reversal by the defendant in this case are: (1) The refusal to direct a verdict for the defendant; (2) allowing the funeral bill to be introduced into evidence and to be considered by the jury; (3) the refusal of the trial court to permit the testimony of the Chief of Police with regard to the arrest of plaintiff's decedent for drunkenness; (4) the refusal to give certain instructions offered by the defendant and the giving of certain instructions offered by the plaintiff over the objection of the de-

fendant; (5) the refusal to declare a mistrial on motion of the defendant because of questions propounded to the prospective jurors on *voir dire* examination as to whether the ability or the inability of the defendant to pay any verdict would affect their decision; and, (6) the refusal to declare a mistrial on motion of the defendant objecting to certain arguments to the jury by plaintiff's counsel.

The controlling question in this case is whether the contributory negligence of the plaintiff's decedent was a question for jury determination, or whether it was one of law for the court.

The uncontradicted evidence shows that the plaintiff's decedent, after purchasing the soft drinks at Steve's Market, started walking across U.S. Highway No. 52 in the Town of Keystone, with his head down, when the defendant's car was approaching from his right with its headlights burning; that he proceeded in this manner for a distance of some 20 feet and walked into the left front of defendant's vehicle. Witnesses who testified during the trial stated that they saw the plaintiff's decedent walk across the street and the defendant's automobile approaching him, and one of the witnesses stated that after seeing both the automobile and the decedent he realized that plaintiff's decedent was going to be struck and so informed his father. The action of the plaintiff's decedent showed a disregard for his own safety. Ordinarily, in a case such as the one presented here, the negligence and contributory negligence are questions of fact for the jury. *Bower* v. *Brannon,* 141 W. Va. 435, 90 S. E. 2d 342; *Stamper* v. *Bannister,* 146 W. Va. 100, 118 S. E. 2d 313. Notwithstanding this general rule, a pedestrian cannot disregard his own safety and then come within the general rule. It is a duty of a pedestrian to use his eyes and protect himself against impending danger. If he does not do so when he has the opportunity so to do he will be guilty of contributory negligence as a matter of law. *Pritchard* v. *City Lines of West Virginia, Inc.,* 136 W. Va. 278, 66 S. E. 2d 276; *Brake* v. *Cerra,* 145 W. Va. 76, 112 S. E. 2d 466; *Holloway* v. *Holloway,* (N.C.) 136 S. E. 2d 559, (Advance Sheet).

A pedestrian cannot move into the path of an approaching automobile and be struck thereby and absolve himself of contributory negligence. The uncontradicted testimony of Michael Colo alone shows such contributory negligence. *Milby* v. *Diggs*, 118 W. Va. 56, 189 S. E. 107. Even if plaintiff's decedent had not seen defendant's automobile approaching from his right at the time he started across the street, by virtue of not looking or not looking effectively, had he merely looked to his right effectively when he was half-way across the street he would have then seen the defendant's car nearing him and could have ascertained at that time that he would be struck if he continued forward. One cannot in reckless disregard for his own safety put himself in a position where he would be struck by an automobile, such as plaintiff's decedent did in the instant case. Such action on the part of the plaintiff's decedent indicates that he was not exercising the care that an ordinarily prudent person would employ in like situations, and therefore the question of contributory negligence becomes one of law for the court to decide under the facts presented in this case. *Ray* v. *Clawson*, 123 W. Va. 99, 14 S. E. 2d 259.

The case of *Barr* v. *Curry*, 137 W. Va. 364, 71 S. E. 2d 313, is quite similar to the instant case. In that case the plaintiff's decedent, a pedestrian, walked out into the highway and was not observed by the defendant motorist until the motorist was about three or four feet from him at which time the defendant's car struck the plaintiff's decedent and his body was found 128 feet from the point of impact. The plaintiff's decedent was wearing dark clothing at the time of the accident and it occurred at night with the lights of the automobile on. It was held in that case that the plaintiff's decedent and the defendant each owed a mutual duty to avoid the accident and each was required to exercise the care required of a reasonably prudent man under the circumstances, and although the decedent was not required to keep a constant lookout he was required to appraise the situation with regard to the dangers of the approaching automobile which he could easily see. He could have avoided being struck by the automobile had he turned and walked away, but instead remained in a dangerous location while

attempting to kick broken glass off the highway. It was held that the plaintiff's decedent was guilty of contributory negligence as a matter of law, and therefore there could be no recovery by the plaintiff.

The case of *Holloway* v. *Holloway, supra,* is almost on all fours with the case at bar. In that case the defendant's automobile was being driven at up to 50 miles per hour in a 35 mile per hour zone when it struck the pedestrian as he was almost across the highway and he could have seen the automobile about three blocks away. It was held that the pedestrian's negligence was one of the proximate causes of his injury and there could be no recovery as a matter of law.

It is the contention of the plaintiff that the case at bar falls under the rule of *Bower* v. *Brannon,* 141 W. Va. 435, 90 S. E. 2d 342, which is cited and approved in the case of *Stamper* v. *Bannister, supra.* In the *Bower* case Judge Browning collected a number of cases where pedestrians were struck by automobiles and although he states in the opinion that the place of collision in the street is not conclusive, he pointed out the tendency of cases to hold that where a pedestrian who walks into a street or highway is struck at or near the curb or edge of the street or highway from where he had started to cross to the other side, the plaintiff is guilty of contributory negligence as a matter of law, and in cases where the plaintiff was struck at or beyond the center of the street or highway, the question of contributory negligence was usually one for jury determination. This statement, contained in the *Bower* and *Stamper* cases, is not a rule but merely a deduction made from numerous cases dealing with pedestrians who were struck by automobiles in a street or highway. Both the *Bower* and *Stamper* cases clearly state, notwithstanding the collection of cases, that the place of the collision in the highway is not conclusive as to whether or not the pedestrian's negligence is a matter for jury determination or a matter for the court. The case at bar is not controlled by these cases because the facts and existing circumstances are different. In the *Bower* case there was a hill about 200 yards from where the plaintiff started to cross the highway and when defendant's auto-

mobile was on the other side of the hill it could not have been seen, while in the *Stamper* case, although the plaintiff's decedent was struck when he was almost across the double lane highway, the defendant's car was turned from its lane to the lane in which the plaintiff's decedent was struck and as a result thereof the plaintiff's decedent was killed. Had the defendant's car in the *Stamper* case been driven in its right hand lane that accident would not have occurred. Then, too, in the *Bower* case a witness stated that when he first saw the lights of defendant's automobile approximately 400 feet away it was being driven between 80 and 85 miles per hour toward the point where the plaintiff's decedent was walking across the road.

As indicated herein, it is clearly apparent that notwithstanding any negligence on the part of the defendant, the plaintiff's decedent was himself guilty of contributory negligence as a matter of law, and under the evidence presented in the record of this case the trial court should have directed a verdict in favor of the defendant upon a motion which was timely made on behalf of the defendant or upon the instructions offered by defendant calling for such verdict. Inasmuch as this was not done it constituted reversible error. By virtue of what we now hold, it will be necessary to reverse the judgment of the trial court, set the verdict aside and award the defendant a new trial.

Several other assignments of error were made, and while they are not the turning point of this case, they will be discussed now for information in the event the case is retried.

The admitting into evidence of the funeral bill and the allowing it to be considered as pecuniary damages by the jury, which returned the verdict in the amount of $741.14 for such expenses, constituted error. The evidence in this case indicates that one of the distributees, George Hamlette, was liable for the funeral expenses of plaintiff's decedent. This, under the holding in one of our recent decisions, would have been a proper element of damages in a wrongful death action, it having been so decided in the case of *Stamper* v. *Bannister, supra.* It was stated in that case that: "Although some courts have held otherwise, the weight of

authority in this country is that such expenses are admissible in evidence as proper elements of damage in wrongful death actions if the distributee or distributees sustain a loss as a result thereof and the amounts charged are reasonable. 25 C.J.S., Death, §108, 94 A.L.R. 441. It is true that any money received by the distributee or distributees in a wrongful death action is not subject to any debts of the deceased, but if the distributee or distributees will suffer or have sustained a loss thereby, such as where they are liable for or have paid such expenses, or where the estate is diminished by the payment of same and their distribution therefrom has been accordingly diminshed, such items are admissible as elements of damage."

However, the Legislature in 1961, soon after the *Stamper* case was decided, changed the wrongful death statute, Code, 55-7-6, as amended, by adding the following language:

"Items of pecuniary loss or expenses recoverable under general law by the personal representative of the deceased for the benefit of the estate of the deceased, including but not limited to loss or expense caused by damage to property of the deceased, reasonable and necessary expense incurred in medical or surgical treatment, hospitalization, and burial of deceased *shall not be admissible in evidence or considered by the jury in such action.* Nothing herein contained shall bar the recovery of such items of loss or expense in an action proper for such purpose." [Emphasis supplied]

The effect of the amendment of the legislature is to leave in some confusion the question of how the funeral expenses may be obtained from a negligent wrongdoer. The only thing that is now certain is that they cannot be obtained as part of the damages in a wrongful death action. We do not have before us the question of whether they may be sued for in some other action as the legislature implies by the use of the term "general law", which perhaps was intended to be synonomous with "common law", although, more properly, the term is used to refer to a law which affects the state as a whole as distinguished from a local or special law.

At common law there was no cause of action for the recovery of damages for wrongful death. 25 C.J.S., Death,

§13. Whether some representative of the decedent could sue for the burial expenses was not a settled question at common law, and apparently the weight of authority was against it. See *Tollerson* v. *Atlantic Coast Line R. Co.,* 188 S. C. 67, 198 S. E. 164, where plaintiff, having let the statute of limitations pass on a wrongful death action, was denied any recovery for burial expenses in a common law action.

To remedy this defect in the common law, most states have passed one or both of two types of acts: "Lord Campbell's Act", creating a wrongful death action usually for benefit of distributees, and "Survival Statutes", preserving to a representative causes of action decedent might have had if he had recovered, and some times referred to as actions for "the benefit of the estate". The question immediately arose under both of these acts as to damages for the funeral bill, and by the majority American rule such recovery has been allowed under one or the other of the statutes, although there is a distinct minority to the contrary. The law is practically all statutory. 25 C.J.S., Death, §108.

Regardless of other states, the legislative amendment in West Virginia prevents recovery of funeral expenses in a wrongful death action, and, therefore, Plaintiff's Instruction 11, given by the court, was error in allowing the jury to award additional damages for this item and to specify the amount thereof in its verdict.

It is true that when the wrongful death statute, Code, 55-7-6, was amended, it provided: "In every case in which the jury shall give damages for financial or pecuniary loss in such action, the jury shall state in their verdict the part thereof given for such financial or pecuniary loss." This only referred to pecuniary loss to the beneficiaries such as loss of wages or an income loss suffered by the distributees as a result of the decedent's death wherein his income or wages were terminated, but this provision cannot apply to pecuniary loss incurred in the form of funeral or burial expenses of the deceased which are specifically prohibited by the same amendment as evidence and withdrawn from consideration of the jury in such cases.

Although evidence was introduced to the effect that Laura Hancock, one of the distributees who had reared the decedent as her own son, was nervous, crying and near collapse when she was told of the death of the plaintiff's decedent, we are of the opinion the refusal of the trial court to permit the Chief of Police Oliver to testify concerning the various arrests of plaintiff's decedent for drunkenness was not reversible error. There is no evidence that Laura Hancock knew of such conduct on the part of plaintiff's decedent which would have made her less sorrowful at his demise. In fact the evidence indicates the contrary and the omission of this evidence concerning drunkenness was no doubt proper. *Simmons* v. *McConnell's Adm'r.*, 86 Va. 494, 10 S. E. 838. Also, there was no evidence tending to show the sobriety of plaintiff's decedent which would allow the contradiction thereof. *Basham* v. *Terry*, 199 Va. 817, 102 S. E. 2d 285. In like manner it was not improper for the court to refuse to permit Chief Oliver to testify that it looked like the plaintiff's decedent had been drinking five or six hours prior to the accident because this would be, because of remoteness, no indication that he was drinking when the accident occurred.

It was not error for the trial court to give Instruction No. 4 offered by the plaintiff because it merely told the jury that it was the duty of the defendant to exercise reasonable care in order to avoid injury to pedestrians and that if the jury found from the evidence that he was not exercising reasonable care and maintaining the proper lookout, or that he was driving at an unreasonable rate of speed or was not exercising reasonable care in keeping his automobile under control in order that it could be stopped, the verdict would be found for the plaintiff unless it found further that the decedent was guilty of contributory negligence. This Instruction merely relates to reasonable care being exercised in various contingencies by the parties.

Instruction No. 6 offered by the defendant and given by the court told the jury that the burden of proving contributory negligence on the part of plaintiff's decedent was on the defendant and in the absence of such evidence there was

a legal presumption that plaintiff's decedent acted with due care for his own safety.

It is true that the burden of proving contributory negligence rests on the defendant, but the jury may look to all of the evidence offered by both parties in determining whether or not the plaintiff's decedent is guilty of contributory negligence. *Barrickman* v. *Marion Oil Co.*, 45 W. Va. 634, 646, 32 S. E. 327; *Melton* v. *Chesapeake and Ohio Railway Co.*, 71 W. Va. 701, 78 S. E. 369. In other words, the burden to show contributory negligence in such cases rests upon the defendant unless it is disclosed by the plaintiff's evidence or may be fairly inferred by all of the evidence and circumstances surrounding the case. 13 M.J., Negligence, § 56; *Mullens* v. *Virginian Railway Company*, 94 W. Va. 601, 119 S. E. 852; *Leftwich* v. *Wesco Corporation*, 146 W. Va. 196, 119 S. E. 2d 401. The first part of the instruction contains a statement that would indicate that the jury could consider all of the evidence relating to this matter, and we are therefore of the opinion that the giving of this instruction did not constitute reversible error but it should have been more clearly worded to show that the jury could consider both the evidence of the defendant and the plaintiff in connection with this matter.

Instructions A and B offered by the defendant and refused by the court were peremptory instructions pertaining to the contributory negligence on the part of plaintiff's decedent and therefore the refusal constitutes reversible error.

Instruction D offered by the defendant and refused by the trial court is a proper instruction covering the legal principle in the case at bar and should have been given. The trial court indicated that it was refused because it was covered by Instruction 2 offered by the plaintiff. Instruction 2 only covers the first part of Instruction D with regard to reasonable care and does not cover or contain the latter part of Instruction D relating to the circumstances then existing at the time of the accident. However, Instructions E and F offered by the defendant and after amendment given by the trial court taken together with Instruction 2, would perhaps cover the entire contents of Instruction D offered by the

defendant. Therefore, we are of the opinion that the refusal of Instruction D, considering all of the instructions taken together, did not constitute reversible error. *Keffer v. Logan Coca-Cola Bottling Company*, 141 W. Va. 839, 93 S. E. 2d 225; *Graham v. Wriston*, 146 W. Va. 484, 120 S. E. 2d 713; *Walker v. Monongahela Power Co.*, 147 W. Va. 825, 131 S. E. 2d 736.

The refusal of the trial court to declare a mistrial on motion of defendant on the question asked on *voire dire* as to whether the defendant's ability or inability to pay the amount of any verdict that might be rendered would affect their decision did not constitute reversible error because it only dealt with an economic situation and was not prejudicial to the defendant. These questions did not indicate that the defendant carried liability insurance and therefore did not come within the rule laid down in *Lynch v. Alderton*, 124 W. Va. 446, 20 S. E. 2d 657. If the intention was to indicate the existence of insurance and it would be so interpreted by the average juror, of course we would have to reverse on that point alone. We do not here have a clear example of such improper intention.

The defendant objected to certain statements made by one of the counsel for the plaintiff in his closing arguments wherein he stated that: " * * * Norman Vincent Peale said in a radio broadcast some time ago, in the mechanics of which, the heart beats 103,680 times a day whose blood travels each day 168,000 miles, who breathes 23,000 times a day, that you inhale 438 cubic feet of air, that each person will speak 4800 words a day, and will use 7,000,000 brain cells. Where in the world is there a machine like this. * * * Can you say that machine, that human life, is not worth $10,000 when you read every day in the newspapers about someone paying $300,000.00 for a race horse, where a baseball player gets $100,000.00 a season. * * * And when you read in the paper they have spent $14,000,000 or the sum of $14,000,000 just to find Amelia Earhart some years ago when she was lost in an airplane, where they spent some $100,000.00 excavating Floyd Collins from a cave some years ago, where thousands of dollars were spent get-

ting a little dog out of a cave, where it fell running rabbits." The objection to this argument was overruled by the trial court and also a motion for a mistrial was overruled with statement that the argument was a little afield. We are of the opinion that this argument of counsel was far afield and the objection should have been sustained by the trial court and the jury instructed not to consider the argument. *Black* v. *Peerless Elite Laundry Co.,* 113 W. Va. 828, 832, 169 S. E. 447. However, it does not appear that this argument was prejudicial in this case because of the amount of the verdict returned by the jury which was less than the maximum allowed. See *Black* v. *Peerless Elite Laundry Co., supra.*

For the reasons stated herein, the judgment of the Circuit Court of McDowell County is reversed, the verdict set aside and a new trial awarded to the defendant.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded.*